MINNESOTA NEWSPAPER ASSOCIATION, INC.,
Plaintiff,

v.

POSTMASTER GENERAL OF the UNITED STATES, United States Postal Service, and United States of America, Defendants.

Civ. No. 3–86–806.

United States District Court,
D. Minnesota,
Third Division.

Dec. 31, 1987.

---

Mark R. Anfinson, Minneapolis, Minn., for plaintiff.

C. Gail Walker, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter comes before the court on the parties' cross-motions for summary judgment. At issue is the constitutionality of certain federal statutes and postal regulations which criminalize the mailing of advertisements or prize lists for lotteries or similar enterprises. Plaintiff Minnesota Newspaper Association ("MNA") contends that the statutes, primarily 18 U.S.C. § 1302 (1982), violate the constitutional standards of free speech and press, and equal protection. Defendant Postmaster General contends that the statutes and related regulations satisfy the standards set out in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). For the reasons stated below, the court grants partial summary judgment for MNA and partial summary judgment for the Postmaster. The challenged statutes are constitutional with respect to advertisements. However, the Postmaster has failed to establish a compelling governmental interest justifying the content-based restrictions on the mailing of prize lists.

## FACTS

Minnesota law allows, subject to extensive regulation, nonprofit charitable organizations to operate gaming activities for fund raising purposes. Minn.Stat. §§ 349.-11–.60 (1986 & Supp.1987). The primary games are bingo, pull tabs, raffles, paddle wheels, and tip boards. These organizations are free to use any form of advertising which does not involve mailing or broadcast.[1]

Plaintiff MNA is the chief representative of the organized newspaper press in Minnesota. MNA's member newspapers distribute a significant portion of their circulation through the United States mails. This dependence on the mails has forced newspapers to reject advertisements from charitable and nonprofit organizations wishing to publicize gaming activities. Such advertisements would run afoul of the restrictions contained in 18 U.S.C. § 1302[2] and 39 U.S.C. §§ 3001[3] and 3005.[4]

Newspapers have also withheld news reports on bingo games and similar lottery operations legally conducted in Minnesota by private organizations because of the confusion that surrounds the interpretation and application of these statutes. Some of MNA's member newspapers have published such advertisements or news reports, and have been threatened with sanctions by representatives of the Postal Service. The Postal Service has also asked MNA to notify its members that further publication would cause the Postal Service to take action against the offending newspapers.

## ANALYSIS

MNA seeks declaratory and injunctive relief. Its member newspapers face the very real threat of prosecution and/or the loss of mailing privileges. MNA itself was asked to warn its members of the serious potential for sanctions.

The Postmaster does not dispute MNA's standing to challenge the constitutionality of 18 U.S.C. § 1302 and 39 U.S.C. § 3001. However, the Postmaster does contend that MNA lacks standing to challenge the constitutionality of 39 U.S.C. § 3005. This section authorizes the issuance of "stop mail" orders against parties who use the mails to conduct a lottery or similar enter-

---

1. 18 U.S.C. § 1304, which is not at issue here, prohibits the broadcast of advertisements or information concerning lotteries or similar enterprises.

2. 18 U.S.C. § 1302 provides in relevant part:
 Whoever knowingly deposits in the mail, or sends or delivers by mail:
 . . . .
 Any newspaper, circular, pamphlet, or publication of any kind containing any advertisement of any lottery, gift enterprise, or scheme of any kind offering prizes dependent in whole or in part upon lot or chance, or containing any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes;
 . . . .
 Shall be fined no more than $1,000 or imprisoned not more than two years, or both; and for any subsequent offense shall be imprisoned not more than five years.

3. 39 U.S.C. § 3001 provides in relevant part:
 (a) Matter the deposit of which in the mails is punishable under section 1302 . . . of Title 18 . . . is nonmailable.

4. 39 U.S.C. § 3005 provides in relevant part:
 (a) Upon evidence satisfactory to the Postal Service, that any person . . . is engaged in conducting a lottery, gift enterprise, or scheme for the distribution of money or of real or personal property, by lottery, chance, or drawing of any kind, the Postal Service may issue an order which—
 (1) directs the postmaster of the post office at which mail arrives, addressed to such a person or to his representative, to return such mail to the sender appropriately marked as in violation of this section, if the person, or his representative is first notified and given reasonable opportunity to be present at the receiving post office to survey the mail before the postmaster returns the mail to the sender; and
 (2) forbids the payment by a postmaster to the person or his representative of any money order or postal note drawn to the order of either and provides for the return to the remitter of the sum named in the money order or postal note.
 (3) requires the person or his representative to cease and desist from engaging in any such . . . lottery, or gift enterprise.
 . . . .
 (d) Nothing in this statute shall prohibit the mailing of (1) a newspaper of general circulation containing advertisements, lists of prizes, or information concerning a lottery conducted by a State acting under authority of State law, published in that State, or in an adjacent State which conducts such a lottery. . . .

prise. The Postmaster argues that § 3005 applies only to those who actually conduct lotteries. Therefore, since MNA and its members do not conduct lotteries, MNA lacks standing to challenge this statute.

The court rejects the Postmaster's argument. Subsection (d) of section 3005 specifically excepts newspapers which carry advertisements or information concerning state-conducted lotteries from the prohibitions of this section. The exception proves the rule. By implication, newspapers which carry advertisements or information concerning *private* gaming operations may be subject to the sanctions of § 3005. Such advertising is precisely the conduct at issue in MNA's suit. Therefore, MNA has standing to challenge 39 U.S.C. § 3005.

### A. Statutory Background

The criminal statute at issue, 18 U.S.C. § 1302, provides that whoever knowingly deposits in the mails, among other things, a newspaper containing any advertisement of a lottery [5] or similar enterprise, or containing a prize list for such lottery or enterprise, is subject to a fine of up to $1,000 and/or imprisonment up to two years for the first offense and up to five years for any subsequent offense.

This prohibition originated in 1890 as an amendment to certain statutes relating to lotteries. 26 Stat. 465. *See also* Act of Mar. 4, 1909, Ch. 321, § 213, 35 Stat. 1129. The constitutionality of this section was upheld in *In re Rapier*, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93 (1892). The Court based its decision on the authority of Congress to establish a postal system. U.S. Const. Art. 1, § 8, cl. 7. That authority includes the power to designate what may and may not be carried in the mails. *Id.* at 133, 12 S.Ct. at 374.

Though the exercise of Congress' postal power through this legislation restricted lotteries, the Court did not "regard the right to operate a lottery as a fundamental right...." *Id.* at 134, 12 S.Ct. at 374. The Court also held that the legislation did not

abridge the freedom of the press. "The circulation of newspapers is not prohibited, but the government declines itself to become an agent in the circulation of printed matter which it regards as injurious to the people." *Id.*

The Supreme Court has recently reiterated the broad scope of the Article I postal power. *United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 126, 101 S.Ct. 2676, 2683–84, 69 L.Ed.2d 517 (1981). "The power possessed by Congress embraces the regulation of the entire Postal System of the country. The right to designate what shall be carried necessarily involves the right to determine what shall be excluded." *Id.* (quoting *Ex parte Jackson*, 96 U.S. (6 Otto) 727, 732, 24 L.Ed. 877 (1877)). However, the Court in *Greenburgh* noted that this power "may not ... be exercised by Congress in a manner that abridges the freedom of speech or of the press protected by the First Amendment to the Constitution." *Id.*

This court must determine whether, in light of the developments in constitutional, particularly First Amendment, jurisprudence over the past century, the statutes at issue impermissibly infringe on the rights of freedom of speech and of the press, or equal protection.

### B. Freedom of Speech and Press

The definition of commercial speech is central to this analysis. 18 U.S.C. § 1302 prohibits the mailing of publications containing, first, advertisements of a lottery or similar enterprise, and, second, lists of prizes for a lottery or similar enterprise. The categorization, commercial or noncommercial speech, of advertisements or prize lists will determine the defendant's burden in justifying these restrictions.

Commercial speech is entitled to First Amendment protections, though less extensive than those afforded to noncommercial

---

5. A lottery, gift enterprise, or similar scheme has three essential elements: (1) the distribution of prizes; (2) according to chance; (3) for consideration. *Federal Communication Comm'n v. American Broadcasting Co.*, 347 U.S. 284, 290,

74 S.Ct. 593, 597–98, 98 L.Ed. 699 (1954). For purposes of this opinion, the term "lottery" includes all games of chance for which the plaintiff's members may not mail advertisements or prize lists.

speech. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 637, 105 S.Ct. 2265, 2274–75, 85 L.Ed.2d 652 (1985). If commercial, the Postmaster must satisfy the standards of *Central Hudson*, 447 U.S. 557, 100 S.Ct. 2343. If noncommercial, the Postmaster faces the almost impossible task of justifying the restriction. *Arkansas Writers' Project, Inc. v. Ragland*, —— U.S. ——, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987).

The Eighth Circuit, in *Garner v. White*, 726 F.2d 1274 (8th Cir.1984), defined commercial speech as "speech which does 'no more than propose a commercial transaction,' or that 'relate[s] solely to the economic interests of the speaker and its audience.'" *Id.* at 1277 (citations omitted). The Seventh Circuit noted, in *Woods v. Evansville Press Co.*, 791 F.2d 480, 484 (7th Cir.1986), that "the term 'commercial speech' has predominantly been used in the first amendment context to describe commercial advertising."

### 1. Advertisements

Most advertisements fall squarely within the definition of commercial speech. A vendor purchases publication space in order to propose a business transaction. The charitable organization which sponsors a lottery has a similar motive. It wants its audience to know that for a sufficient consideration and with a sufficient amount of luck, they may realize a more than sufficient return. The advertisement touches the economic interests of both speaker and audience.

The Supreme Court, in *Central Hudson*, established a four-step analysis for commercial speech. In order to receive First Amendment protection, the speech:

> at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351.

Under the *Central Hudson* test, then, the dissemination of truthful commercial information about a lawful activity can be restricted if it is misleading, or if the government has a substantial interest, directly advanced, and the restriction is no more extensive than necessary.

#### a. Lawful activity, not misleading

The advertising which MNA's members desire to publish would concern lawful gaming enterprises. The Postmaster contends, though, that such advertising is deceptive and misleading if it does not reveal the odds against winning. As such, it is not entitled to the protections of the commercial speech doctrine.

■ Such disclosure is not required in order to include lottery advertisements within the protections of *Central Hudson*. Long odds are inherent in lotteries, and the public knows that. These are, after all, games of chance. Because the speech is not inherently misleading, the government must satisfy the final three steps of *Central Hudson*.

#### b. Substantial governmental interest

The governmental interests advanced by the restrictions on lottery advertisements must be substantial. The Postmaster argues, first, that the restrictions protect the policies of nonlottery states. Those states which prohibit lotteries have made a policy choice to restrict participation in gaming activities. Within the borders of each of these states this is unquestionably a substantial interest. *See Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986) (legislature's interest in health, safety, and welfare of its citizens is substantial).

■ The issue then becomes whether Congress has a substantial interest in protecting those policies. Congress has an interest in exercising its postal power in a manner which allows individual states to make policy choices within the areas that have been reserved to the states. The regulation of lotteries traditionally has been left to the states. Because individual

states have no authority to regulate the U.S. mail,[6] nonlottery states would have no effective means to implement their gaming policy without the prohibitions at issue here. Removing these prohibitions would also undermine the policies of those states which have chosen to allow only limited types of gaming. This latter group of states would have no effective means to implement their limiting policy.

The Supreme Court, in upholding a statute which prohibited the interstate transport of lottery tickets, commented that Congress decided "that it would not permit the declared policy of the states, which sought to protect their people against the mischiefs of the lottery business, to be overthrown or disregarded by the agency of interstate commerce." *Champion v. Ames*, 188 U.S. 321, 357, 23 S.Ct. 321, 327, 47 L.Ed. 492 (1903). *Accord United States v. Stuebben*, 799 F.2d 225, 229 (5th Cir. 1986).

In response, MNA contends that any federal concern for the policies of nonlottery states is decimated by the exceptions contained in 18 U.S.C. § 1307.[7] This section allows newspapers to carry advertisements, prize lists and information concerning a state-conducted lottery if the newspaper is published in that state, or in an adjacent state which also has a state-conducted lottery.

This is a narrow exception. The section is limited to advertisements for state-conducted lotteries and only in newspapers published within states conducting such lotteries. The exception does not affect newspapers in nonlottery states. The section is consistent with the congressional interest in refusing to use the postal power to undermine the policies of nonlottery states.

MNA also contends that the statutes make no distinction between lawful and unlawful lotteries. In other words, once a state permits private lotteries, Congress should be divested of authority to prohibit the mailing of advertising for those lotteries. The Supreme Court addressed a similar argument from a petitioner seeking to have his obscenity conviction overturned. The Court held that "the State's right to abolish all regulation of obscene material does not create a correlative right to force the Federal Government to allow the mails ... to be used for the purpose of sending obscene material into the permissive State." *Smith v. United States*, 431 U.S. 291, 307, 97 S.Ct. 1756, 1767, 52 L.Ed.2d 324 (1977). So, too, the state's right to permit private lotteries does not create a right to use the mails to advertise those lotteries.

The challenged restrictions on the mailing of lottery advertisements comport with the principles of federalism by allowing the individual states to advance their own gaming policies. The restrictions also protect the substantial interests of the states in protecting the health, safety, and welfare of their citizens.

The Postmaster also argues that the prohibitions further a second substantial interest: the government's interest in restricting the interstate growth of private lotteries and reducing the threat of criminal involvement. This was the primary purpose behind the original legislation. The Louisiana Lottery had become so pervasive that only action at the federal level could deal with it. That concern remains relevant and substantial. "With no guarantee from the states that undesirable elements would not profit as licensees, the enactment of these

---

**6.** *See United States Postal Serv. v. Brennan*, 574 F.2d 712, 714 (2d Cir.1978) (only limits on postal power are those prescribed in the Constitution), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979). *See also Bigelow v. Virginia*, 421 U.S. 809, 828–29, 95 S.Ct. 2222, 2235–36, 44 L.Ed.2d 600 (1975) (state cannot prohibit local advertising of out of state services which are legal in the advertiser's state); and *State ex inf. Danforth v. Reader's Digest Ass'n, Inc.*, 527 S.W.2d 355 (Mo.1975) (en banc) (state lottery statute does not interfere with federal postal power).

**7.** 18 U.S.C. § 1307 provides in relevant part:
(a) The provisions of section[ ] ... 1302 ... shall not apply to an advertisement, list of prizes, or information concerning a lottery conducted by a State acting under the authority of State law—
(1) contained in a newspaper published in that State or an adjacent State which conducts such a lottery. . . .

provisions [permitting the mailing of private lottery advertisements] would lead to criminal involvement in gambling." H.R. Rep. No. 1517, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 7007, 7022 (letter from Assistant Attorney General W. Vincent Rakestram).

MNA argues that the highly regulated nature of lottery activity in states like Minnesota makes the Postmaster's concern with criminal involvement insignificant. However, because regulation of these matters is left to the states, the experience of those states which exercise extensive regulatory control over lotteries is not instructive on what would happen in other states. Indeed, the removal of the mailing restrictions in section 1302 may lead some states to liberalize their lottery regulations in order to encourage commerce.

Other statutes also militate against the reemergence of interstate private lotteries. The prohibition on advertising in section 1302 serves as a necessary complement to the other statutory provisions designed to hamper the growth of these lotteries. The Postmaster has demonstrated a substantial governmental interest in reducing the threat of criminal involvement in gaming activities.

### c. Directly advanced

The Postmaster, in the last two steps of the *Central Hudson* analysis, must prove that Congress has chosen an appropriate means to accomplish the asserted interest. *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. The challenged restrictions must directly advance that interest, and the restrictions can be no more extensive than necessary to serve that interest.

The prohibition on advertising keeps mailed advertising, which the states cannot regulate, out of those states which have determined that lotteries must be banned or highly regulated. The prohibitions directly advance the federal government's interest in protecting the policy choices of the individual states.

The restrictions also directly advance the government's interest in preventing the interstate growth of private lotteries. Advertising of private lotteries increases participation. If this were not so, the plaintiff would not be challenging these statutes because there would be no demand from lottery sponsors for newspaper advertising. Effective suppression of interstate private lotteries requires suppression of the advertising which would make such lotteries possible.

The plaintiff contends that the restrictions are ineffective because lottery sponsors shift their advertising to media which are not so restricted. One way or another, information on gaming opportunities reaches the public. This argument misses the point that the government's interest is not in squelching all lottery advertising, but in keeping that advertising, as much as possible, within the state of origin.

### d. No more extensive than necessary

The court is also satisfied that the restrictions on advertising are no more extensive than necessary to serve the government's interest. MNA suggests that the government has several less restrictive options, notably disclaimers within the advertisement, and public education campaigns.

Counterspeech was not in vogue when the statutes at issue were enacted. However, the more recent experience with disclaimers in cigarette advertisements supports the conclusion that disclaimers and public service campaigns, while less extensive, would not effectively advance the stated interests.

The Supreme Court, addressing this argument in its *Posadas* decision, concluded that "it is up to the legislature to decide whether or not such a 'counterspeech' policy would be as effective in reducing the demand for casino gambling as a restriction on advertising." *Posadas*, 106 S.Ct. at 2978.

■ In summary, the court concludes that the restriction on advertisements in 18 U.S.C. § 1302 passes the *Central Hudson* test.

### 2. Prize lists

Lists of prizes awarded, which are also prohibited by 18 U.S.C. § 1302, do not fit

within the definition of commercial speech. Of course, a prize list contained within a lottery advertisement is commercial speech. A list of winners is an effective promotional device. A lottery sponsor would include such a list in order to encourage its audience to participate in a commercial transaction—the lottery.

However, a prize list also has value as news. In the context of a news report, a prize list is truthful information about a public event. It is as newsworthy as the score of a ball game or the review of a play. An editor's decision to publish the list of winners from last night's bingo game is not an offer by the newspaper to engage in a commercial transaction. It is simply news.

Prize lists have no inherent claim to First Amendment protection. It is the context of the prize list, in advertisements or news reports, that determines the level of protection.

The court has already concluded that the government may restrict lottery advertising, and that includes advertisements containing prize lists. However, section 1302 was intended to cover more than prize lists within lottery advertisements. Prize lists are set out in the statute as a separate prohibited category, not a subset of advertisements. The statute was designed to restrict the publication of prize lists in news reports. The restriction on prize lists, therefore, directly infringes on noncommercial speech.

Noncommercial speech is entitled to the full measure of First Amendment protections. In order to justify the prohibition on prize lists, the Postmaster must show that the regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end. *Arkansas Writers' Project, Inc. v. Ragland,* — U.S. ——, 107 S.Ct. 1722, 1728, 95 L.Ed.2d 209 (1987). As the Supreme Court noted in *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983), "this Court has sustained content-based restrictions [of noncommercial speech] only in the most extraordinary circumstances."

The commercial speech doctrine affords a limited measure of protection to commercial speech, and, accordingly, "modes of regulation that might be impermissible in the realm of noncommercial expression" will be allowed with respect to commercial expression. *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1918–19, 56 L.Ed.2d 444 (1978). Section 1302, because it applies the same prohibition to both commercial and noncommercial expression, treats unequals equally. What the court has found to be the government's substantial interest with respect to advertisements must now be found to be a compelling interest with respect to prize lists.

The restriction on publishing prize lists acts as a restraint on the editorial decision making process. "The freedom of speech and of the press guaranteed by the Constitution embraces at least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *First Natl. Bank v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 1415–16, 55 L.Ed.2d 707 (1978) (quoting *Thornhill v. Alabama,* 310 U.S. 88, 101, 60 S.Ct. 736, 743–44, 84 L.Ed. 1093 (1940)). The interests here asserted do not justify imposing the fear of subsequent punishment on an editor who decides to publish a lottery prize list. "The choice of material to go into a newspaper ... constitute[s] the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press...." *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2839–40, 41 L.Ed.2d 730 (1974).

■ The Postmaster has not established a compelling interest justifying the prohibition in 18 U.S.C. § 1302 on the mailing of prize lists. This section of the statute is, therefore, an impermissible infringement on First Amendment rights. The court need not reach the issue of whether the restriction is narrowly drawn.

This court's holding regarding prize lists is inconsistent with the Second Circuit's

opinion in *New York State Broadcasters Ass'n v. United States,* 414 F.2d 990 (2d Cir.1969), *cert. denied,* 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). There the court held that the FCC could prohibit the broadcast of information directly promoting a lottery. *Id.* at 998. The court did not require the finding of a compelling interest to justify this content-based restriction. This is precisely the finding which this court was required to make, concluding that such an interest had not been proven.

This court's holding regarding prize lists is also inconsistent with the Supreme Court's decision in *In re Rapier,* 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93 (1892), which held the entire statute constitutional. However, First Amendment decisions such as *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and its progeny, direct courts to resist governmental interference with the news gathering function.

### 3. News reports and editorials

MNA has asserted that its member newspapers have withheld news coverage and editorial comment on lotteries because of the confusion that surrounds the interpretation and application of these prohibitions.

■ Because section 1302 is a penal statute, it must be strictly construed. *Federal Communication Comm'n v. American Broadcasting Co.,* 347 U.S. 284, 296, 74 S.Ct. 593, 600–01, 98 L.Ed. 699 (1954). The statute is, by its language, limited to advertisements and prize lists. It cannot be construed to extend to general news reports or editorial comment. Accordingly, this court holds that section 1302 does not authorize the exclusion from the mails of newspapers containing general news reports or editorial comment regarding lotteries.

### 4. Severability

The proper analysis to be followed in determining the issue of severability is well established. "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." *Alaska Airlines, Inc.*

*v. Brock,* — U.S. —, 107 S.Ct. 1476, 1480, 94 L.Ed.2d 661 (1987) (quoting *Buckley v. Valeo,* 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976)). A statute is presumed severable if what remains is fully operative as law.

The provisions of section 1302 apply to two items, advertisements and lists of prizes drawn. The court has held the prohibition affecting prize lists invalid. This holding in no way undermines the functioning of the prohibition on lottery advertisements. That segment remains fully operative. Therefore, the language of section 1302 covering prize lists is severed from the statute and the provisions dealing with advertisements remain in effect.

### C. Equal Protection

MNA argues that the classification scheme embodied in section 1302 and related statutes is arbitrary, irrational, and violates the principles of equal protection. MNA contends that newspapers are not treated the same as those advertising media that do not use the mails or airwaves. MNA also asserts that the restrictions discriminate against smaller lottery sponsors which are least able to afford alternate forms of advertising.

Equal protection "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). MNA seems to be presenting two sets of similarly situated groups which are being treated differently. The first is advertising media. Newspapers, along with the broadcast media, because of their dependence on interstate commerce, are treated differently than other media. Second, MNA suggests that lottery sponsors are affected differently by the restrictions.

Before addressing these concerns, the court must determine the appropriate standard of review. MNA contends that strict scrutiny is proper because the statutes infringe on personal rights protected by the Constitution. The Fifth Circuit addressed this issue in *Dunagin v. City of Oxford,* 718 F.2d 738 (5th Cir.1983), *cert. denied,*

467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984), and concluded that strict scrutiny was not appropriate. "[P]arties cannot insist on strict scrutiny merely by asserting a First Amendment right that the court ultimately finds not to be violated." *Id.* at 752.

This court has held that the restrictions on lottery advertising (which, from the plaintiff's perspective, are the only prohibitions still at issue) are constitutional. Because the advertising restrictions in Section 1302 do not violate any fundamental rights, strict scrutiny is not the proper standard. Accordingly, the court must determine whether the statutes are rationally related to a legitimate state interest.

 MNA contends, as noted above, that newspapers are treated differently than those media which do not use interstate commerce. This is a weak argument. Congress has been consistent in prohibiting advertising for lotteries in those media which it regulates—those using the means of interstate commerce. The tenets of equal protection are not violated because other media, beyond Congress' authority, are not similarly regulated. "[I]t is a reasonable ground of classification that a state has power to legislate with respect to persons in certain situations and not with respect to those in a different one." *Id.* at 753 (quoting *Packer Corp. v. Utah,* 285 U.S. 105, 110, 52 S.Ct. 273, 274, 76 L.Ed. 643 (1932)). The federal government has a legitimate interest in protecting the policies of the individual states with regard to lotteries. As noted above, that interest is directly advanced by the restrictions.

 The plaintiff's contention that this regulatory scheme is riddled with inconsistencies has already been addressed. The exception in section 1307 for state-conducted lotteries is narrow. Newspapers in those states can publish advertising and information related to the state-conducted lotteries only. They are not free to publish advertisements for a private lottery because of that exception. Section 1307 represents a reasonable balancing of the interests of those states which conduct lotteries with the concerns of those states which do not.

Second, MNA has asserted that the restrictions discriminate unfairly against less prosperous lottery sponsors which cannot afford alternate forms of advertising. The court notes, first, that these lottery sponsors are not parties in this action. MNA has not asserted that it has standing to argue the claims of these third parties. Nonetheless, the court will address this issue.

The plaintiff's assertions go to the discriminatory impact of these statutes. MNA has not argued that the statutes were promulgated with the intent to discriminate against less prosperous lottery sponsors. If the statutes do have the asserted impact, and no facts are in the record to indicate such, the plaintiff's argument is flawed because MNA no where suggests the existence of a discriminatory intent. *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264-65, 97 S.Ct. 555, 562-63, 50 L.Ed.2d 450 (1977).

### D. 39 U.S.C. §§ 3001 and 3005

Section 3001 provides, *inter alia,* that matter which is punishable under 18 U.S.C. § 1302 is nonmailable. This provision must be applied consistent with the court's holding on 18 U.S.C. § 1302.

Section 3005 is a broadly worded provision which has remained in the background of this suit. The court simply directs that this section shall not be enforced in a manner which is inconsistent with the court's holding on 18 U.S.C. § 1302. In other words, section 3005 shall not be applied to prevent the mailing of newspapers containing news reports on lotteries, including news reports containing prize lists, or editorial comment on lotteries.

### CONCLUSION

The restriction in 18 U.S.C. § 1302 on the mailing of lottery advertisements is constitutional under the standards set out in *Central Hudson.* The restriction on the mailing of lists of prizes does not survive constitutional scrutiny because the government has not established the compelling interest necessary to justify this content-

based prohibition. The statute, strictly construed, does not apply to news reports or editorials. Finally, the restriction on lottery advertising does not offend the principles of equal protection.

Accordingly, IT IS ORDERED that:

1. The motion of defendant Postmaster General for summary judgment is PARTIALLY GRANTED and the motion of plaintiff MNA is PARTIALLY DENIED. The court declares that the restriction in 18 U.S.C. §§ 1302 on the mailing of advertisements for lotteries is constitutional and fully enforceable.

2. The motion of plaintiff MNA for summary judgment is PARTIALLY GRANTED and the motion of defendant Postmaster General is PARTIALLY DENIED. The court declares that the restrictions in 18 U.S.C. § 1302, and its implementing regulations, on the mailing of lists of prizes awarded from a lottery are unconstitutional. The defendant is permanently enjoined from further enforcement of the restrictions on prize lists.

3. The motion of defendant Postmaster General to strike affidavits is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.