**VALLEY BROADCASTING COMPANY,** *d/b/a* **KVBC (TV), Channel 3, Las Vegas, Nevada, and Sierra Broadcasting Company,** *d/b/a* **KRNV (TV), Channel 4, Reno, Nevada, Plaintiffs,**

v.

**UNITED STATES of America and Federal Communications Commission, Defendants.**

**No. CV–S–92–400–PMP (RJJ).**

United States District Court, D. Nevada.

April 13, 1993.

Janet F. Rogers, Las Vegas, NV, Gerald Rourke, Washington, DC, for plaintiffs.

Greg Addington, Asst. U.S. Atty., Las Vegas, NV, Peter D. Coffman, Trial Atty., Federal Programs Branch, Civ. Div., U.S. Dept. of Justice, Washington, DC, for defendants.

## ORDER

PRO, District Judge.

Before the Court for consideration are Plaintiffs Valley Broadcasting Company and Sierra Broadcasting Company's Motions for Summary Judgment (# 18 and # 23) and Defendants United States of America and Federal Communications Commission's Cross-Motion for Summary Judgment (# 24).

### I. Facts

Plaintiff Valley Broadcasting Company ("Valley") is a Nevada corporation licensed by the Federal Communications Commission ("FCC") to operate a television station, KVBC, in Las Vegas, Nevada. The primary geographic market which KVBC serves is Las Vegas and Southern Nevada. KVBC's transmitter, however, has the capacity to produce a grade B signal which reaches the Utah/Nevada border.[1] Based on this, potentially 4% (13,200/302,200) of all households which may receive KVBC signals are Utah citizens. Similarly, Plaintiff Sierra Broadcasting Company ("Sierra") is a Nevada corporation licensed by the FCC to operate KRNV, a television station located in Reno, Nevada. Although the primary broadcast area for KRNV is Reno, approximately 19% (37,200/197,200) of the households which receive KRNV signals reside in California. *See*

---

1. Typically, television signals are broken down into two signals: one, a grade A or city grade signal, and two, a grade B signal. Although a grade B signal is theoretically strong enough to be viewable, a number of things such as the physical contours of the surrounding area (e.g., mountains) may affect the overall reception of a grade B signal. *See* Counter–Motion for Summary Judgment (# 24), Exhibit C at 14–23.

Cross–Motion for Summary Judgment (# 24), Exhibit C.[2]

Plaintiffs desire to broadcast commercials related to legal gaming activities located in Nevada such as blackjack, craps, poker, roulette, slot machines, and other lawful games of chance. Reply (# 28) at 3.[3] Plaintiffs, however, have been deterred from doing so based on the FCC's enforcement of 18 U.S.C. § 1304[4] and 47 C.F.R. § 73.1211[5], which prohibit the broadcast of all promotional advertising involving casino gambling. Motion for Summary Judgment (# 18), Exhibit 3 at 3.[6] In support of this policy, the FCC maintains that it has a substantial interest in inhibiting the growth of legalized gambling and its perceived social ills, as well as a federalism interest in furthering the public policies of California and Utah which prohibit casino gambling. *See* Cross–Motion for Summary Judgment (# 24) at 41–48: Reply (# 40) at 7–16.

Plaintiffs seek injunctive relief and a declaratory judgment from this Court that gambling and casino activities which are legal in the State of Nevada do not come within the scope of § 1304 or § 73.1211, or if they do, that the statute and regulation as construed by the FCC are unconstitutional. Plaintiffs argue that: (1) advertising casino gaming is not a "lottery, gift enterprise, or

---

2. Approximately 1,800,000 people presently live in Utah, while California's population is approximately 30,400,000. Statistical Abstract of the United States 1992, 112th Ed., at 22.

3. It is undisputed that advertising of casino gambling is pervasive in Nevada including, but not limited to, such modes as billboards, outdoor advertising, flyers, magazines, newspapers, direct mail, brochures, and cable television other than origination cablecasting. Motion for Summary Judgment (# 18), Exhibit 3 at 2; Second Motion for Summary Judgment (# 23), Exhibit 12. In addition, advertisements relating to casino gaming may be received by residents in adjacent states through such means as billboards on interstate highways and the receipt of Nevada periodicals and newspapers such as the Las Vegas Review Journal. Motion for Summary Judgment (# 18), Exhibit 5; Second Motion for Summary Judgment (# 23), Exhibits 11, 12.

4. 18 U.S.C. § 1304 provides:
   Whoever broadcasts by means of any radio or television station for which a license is required by any law of the United States, or whoever, operating any such station knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, whether said list contains any part or all of such prizes, shall be fined not more than $1,000 or imprisoned not more than one year or both.
   Each day's broadcasting shall constitute a separate offense.

5. 47 C.F.R. § 1211 provides in pertinent part:
   (a) No licensee of an AM, FM, or television broadcast station, ..., shall broadcast any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependant in whole or in part upon lot or chance, ...
   (b) The determination whether a particular program comes within the provisions of paragraph (a) of this section depends on the facts of each case. However, the Commission will in any event consider that a program comes within the provisions of paragraph (a) of this section if in connection with such program a prize consisting of money or other thing of value is awarded to any person whose selection is dependant in whole or in part upon lot or chance, if as a condition of winning or competing for such prize, such winner or winners are required to further any money or other thing of value ...
   (c) The provisions of paragraphs (a) and (b) of this section shall not apply to an advertisement, list of prizes or other information concerning:
   (1) A lottery conducted by a State acting under the authority of State law which is broadcast by a radio or television station licensed to a location in that State or any other State which conducts such a lottery....
   (3) Any gaming conducted by an Indian Tribe pursuant to the Indian Gaming Regulatory Act....
   (4) A lottery, gift enterprise or similar scheme ... that is authorized or not otherwise prohibited by the State in which it is conducted and which is:
   (i) Conducted by a not-for-profit organization or a governmental organization; or
   (ii) Conducted as a promotional activity by a commercial organization and is clearly occasional and ancillary to the primary business of that organization.
   (d)(1) For purposes of paragraph (c) of this section, "lottery" means the pooling of proceeds derived from the sale of tickets or chances and allotting those proceeds or parts thereof by chance to one or more chance takers or ticket purchasers. It does not include the placing or accepting of bets or wagers on sporting wagers or contests.

6. Although Plaintiffs cannot point to any current criminal prosecution under § 1304, the record is clear that the FCC actively enforces both § 1304 and § 73.1211 through the issuance of fines and other penalties. Second Motion for Summary Judgment (# 23), Exhibits 8, 9, and 10.

similar scheme" within the meaning of § 1304 and § 73.1211; (2) that § 1304 and § 73.1211 as applied to casino gambling violate the First Amendment's protection of commercial speech; and (3) the FCC's prohibition on advertising of casino gaming by television or radio stations, and not other forms of the media, violates the Equal Protection Clause.

## II. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 883 (9th Cir.1982). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56 (1986); *California Arch. Bldg. Prod. v. Franciscan Ceramics,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

If the party seeking summary judgment meets this burden, then summary judgment will be granted unless there is significant probative evidence tending to support the opponent's legal theory. *First National*

*Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Commodity Futures Trading Commission v. Savage,* 611 F.2d 270 (9th Cir.1979). Parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Likewise, "legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Id.*

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–06 (9th Cir. 1982); *Admiralty Fund v. Jones,* 677 F.2d 1289, 1293 (9th Cir.1982).

All facts and inferences drawn must be viewed in the light most favorable to the responding party when determining whether a genuine issue of material fact exists for summary judgment purposes. *Poller v. CBS, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). After drawing inferences favorable to the respondent, summary judgment will be granted only if all reasonable inferences defeat the respondent's claims. *Admiralty Fund v. Tabor,* 677 F.2d 1297, 1298 (9th Cir.1982).

The trilogy of Supreme Court cases cited above establishes that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.,* 477 U.S. at 327, 106 S.Ct. at 2555, *quoting* Fed.R.Civ.P. 1). *See also Avia Group Int'l. Inc. v. L.A. Gear Cal.,* 853 F.2d 1557, 1560 (Fed.Cir.1988).

## III. Discussion

### A. Standing

■ Defendants contend that Plaintiffs do not have standing to challenge § 1304 and

§ 73.1211. More specifically, Defendants contend that Plaintiffs are not presently threatened with prosecution under § 1304, and that Plaintiffs have not given any particulars about the advertisements which they desire to broadcast. Cross–Motion for Summary Judgment (# 24) at 10. This Court disagrees.

As illustrated by the Exhibits submitted by Plaintiffs, the FCC actively enforces the provisions of § 1304 and § 73.1211 through the use of fines ranging up to $12,500. Second Motion for Summary Judgment (# 23), Exhibit 8. Moreover, Plaintiffs have clearly stated the nature and content of the advertisements which they desire to broadcast, and the FCC has historically found similar advertisements in violation of these provisions. Second Motion for Summary Judgment (# 23), Exhibits 8, 9, and 10. Accordingly, since Plaintiffs have demonstrated a reasonable threat of injury as a result of the FCC's enforcement of § 1304 and § 73.1211, this Court finds that Plaintiffs have standing to bring their present claims. *See Adult Video Association v. Barr,* 960 F.2d 781, 785–86 (9th Cir.1992), *petition for cert. filed,* 61 U.S.L.W. 3371 (Nov. 2, 1992).

### B. The Applicability of § 1304 to Casino Gambling

■ Plaintiffs argue that § 1304, by its terms, does not prohibit broadcasting advertisements relating to casino gaming. Plaintiffs insist that in order to fall within the scope of § 1304, the advertisement must relate to a "lottery, gift enterprise, or similar scheme." Plaintiffs contend that since casino games such as blackjack, craps, or roulette are qualitatively different than a "lottery" or "gift enterprise," such games cannot be considered "similar schemes" under § 1304.[7]

The seminal case which defines the terms "lottery, gift enterprise, or similar scheme" is *F.C.C. v. American Broadcasting Co.,* 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954).

In *American Broadcasting,* recognizing that the language and legislative history of § 1304 was somewhat unclear, the Supreme Court stated that there are three essential elements of a "lottery, gift enterprise, or similar scheme": (1) the distribution of prizes; (2) according to chance; (3) for consideration. *Id.* at 289–91, 74 S.Ct. at 597–98; *see also* 47 C.F.R. § 73.1211(b).

Applying these elements to the casino activities which Plaintiffs desire to advertise in Nevada leads to the inescapable conclusion that such games fall within the reach of § 1304. There can be no real dispute that the money bet in such games qualifies as consideration, the money received upon a successful wager constitutes a prize, and that winning these games is dependant largely on chance. Therefore, Plaintiffs' argument that casino gaming does not fall within the scope of § 1304 must be rejected.

### C. First Amendment

■ Plaintiffs next argue that a ban on the proposed gaming advertisements violates their rights to commercial free speech under the First Amendment.

In *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Supreme Court recognized that First Amendment protects commercial speech, or speech which is related solely to the economic interests of the speaker and its audience, from unwarranted governmental regulation because it serves the "economic interest of the speaker, . . . assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Id.* at 562–63, 100 S.Ct. at 2349–50. The Supreme Court further recognized that:

> In applying the First Amendment to this area, we have rejected the 'highly paternalistic' view that government has complete power to suppress or regulate com-

---

**7.** The narrow meaning which Plaintiffs ascribe to the terms of "lottery" and "gift enterprise" are discussed in a footnote in *F.C.C. v. American Broadcasting Co.,* 347 U.S. 284, 74 S.Ct. 593, 98 L.Ed. 699 (1954) which stated:

A typical 'lottery' is a scheme in which tickets are sold and prizes are awarded among the ticketholders by lot. A typical 'gift enterprise' differs from this in that it involves the purchase of merchandise or other property; the purchaser receives, in addition to the merchandise or other property, a 'free' chance in a drawing.

*Id.* at 290, n. 8, 74 S.Ct. at 598, n. 8.

mercial speech. '[P]eople will perceive their own best interests if only they are well enough informed and ... the best means to that end is to open the channels of communication, rather than to close them.'

*Id.* at 562, 100 S.Ct. at 2349 (citations omitted).

■ Based on these principles, the Supreme Court in *Central Hudson* established a four-part analysis for evaluating the constitutionality of governmental regulations limiting commercial speech. Under this analysis, a court must ask: (1) does the commercial speech involved concern lawful activity which is not misleading; (2) if so, is there a substantial governmental interest in regulating such speech; (3) if so, does the regulation directly advance the governmental interest asserted; and finally, (4) is the regulation more extensive than necessary to serve the governmental interest. *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351; *Board of Trustees, State Univ. of N.Y. v. Fox,* 492 U.S. 469, 475, 109 S.Ct. 3028, 3032, 106 L.Ed.2d 388 (1989). In applying this analysis to the case, the FCC bears the burden of demonstrating a substantial state interest, as well as justifying the scope of any restrictions advancing this interest. *See Fox,* 492 U.S. at 480, 109 S.Ct. at 3034; *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 647, 105 S.Ct. 2265, 2279, 85 L.Ed.2d 652 (1985).

■ With regard to the first prong, Defendants concede, as they must, that the advertisements which Plaintiffs propose to broadcast relate to lawful activity within the State of Nevada and are not misleading. Cross-Motion for Summary Judgment (# 24) at 41, n. 25. Therefore, this Court has little difficulty finding that advertisements relating to lawful casino gaming within Nevada constitute commercial speech protected by the First Amendment.

As to *Central Hudson's* second prong, Defendants assert two substantial interests which are served by a ban on all television and radio advertising of legalized casino gambling: (1) a federalism interest in protecting the policies of states which have not legalized casino gaming; and (2) retarding the growth of private gambling which has been associated with harmful social effects including the spread of organized crime. *See* Cross–Motion for Summary Judgment (# 24) at 41–48: Reply (# 40) at 7–16.

Several courts, including the Supreme Court, have recognized that within its borders, a state has a substantial interest in regulating the health, safety, and welfare of its citizens; that gambling implicates these concerns; and that the federal government has an interest protecting state choice on this issue. *See Posadas de Puerto Rico Assoc. v. Tourism Co.,* 478 U.S. 328, 341, 106 S.Ct. 2968, 2976 (1986); *United States v. Stuebben,* 799 F.2d 225, 228–29 (5th Cir.1986); *Edge Broadcasting Co. v. United States,* 732 F.Supp. 633, 638–39 (E.D.Va.1990), *affirmed,* 956 F.2d 263, *cert. granted,* —— U.S. ——, 113 S.Ct. 809, 121 L.Ed.2d 683 (1992); *Minnesota Newspaper Ass'n v. Postmaster General,* 677 F.Supp. 1400, 1404 (D.Minn. 1987), *appeal dismissed* 488 U.S. 998, 109 S.Ct. 632, 102 L.Ed.2d 766 (1989); *compare Bigelow v. Virginia,* 421 U.S. 809, 822–25, 95 S.Ct. 2222, 2232–34, 44 L.Ed.2d 600 (1974). As a result, this Court finds that Defendants have a "substantial state interest" in exercising their commerce clause powers in a manner which respects individual state choice with regard to gambling.

This Court, however, rejects Defendants' argument that the desire to curtail the spread of organized crime and the social costs of legalized gambling warrants the ban on advertising of casino gaming at issue in this case. With respect to furthering the spread of organized crime, other than reiterating the well-worn argument that the large sums of cash utilized in casino operations are attractive to criminal elements, Defendants offer no specific evidence to support their assertion that licensed modern day casinos, which are subjected to heavy regulation, are the serious vehicles of organized crime. *See Zauderer,* 471 U.S. at 647, 105 S.Ct. at 2279, *compare, California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 221, 107 S.Ct. 1083, 1094, 94 L.Ed.2d 244 (1987). Furthermore, to the extent casino gaming can be viewed as an attraction to elements of organized crime, Defendants offer no evidence that such elements are any more per-

vasive in casino gaming than in other forms of gaming for which no advertising limitations are enforced by the FCC.

■ Similarly, the social costs associated with legalized gambling, while very real, are hardly limited to casino gambling. They are common to all forms of legalized gambling including state lotteries, Indian casinos, horse racing, and charitable gambling. In light of the fact that Congress has allowed interstate advertising of these latter forms of gambling and has generally left the question of whether to permit and regulate gambling to the states, it makes sense that the primary federal interest relating to the social costs of gambling is limited to the protecting individual state choice on this issue. *See* 18 U.S.C. § 1307; 47 C.F.R. § 73.1211(c); *dicta, United States v. Gambling Devices,* 346 U.S. 441, 450–452, 74 S.Ct. 190, 195–196, 98 L.Ed. 179 (1953); *United States v. King,* 834 F.2d 109, 111–113 (6th Cir.1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988); *Sterling Suffolk Racecourse Limited Partnership v. Burrillville Racing Association, Inc.,* 802 F.Supp. 662, 668–69 (D.R.I.1992), *affirmed,* 989 F.2d 1266 (1st Cir.1993).

■ The third prong of *Central Hudson* requires Defendants to demonstrate that § 1304 directly advances its interest in protecting state choice on the issue of casino gambling. Defendants "cannot regulate speech that poses no danger to the asserted state interest." *Central Hudson,* 447 U.S. at 565, 100 S.Ct. at 2350. Furthermore, governmental prohibitions which are speculative and only remotely advance the state interest involved simply cannot justify silencing promotional advertising. *Id.* at 569, 100 S.Ct. at 2353; *Edge Broadcasting Co.,* 732 F.Supp. at 639. After careful consideration of the activity which is banned here and the interests of all those involved, it is clear to this Court that § 1304 as it is currently applied against Plaintiffs fails to satisfy the third prong of *Central Hudson.*

As stated earlier, Defendants' substantial state interest in this case is its federalism concern of protecting state choice on the issue of gambling. It is clear that the states implicated in this case, Nevada, Utah, and California, have divergent perspectives on the social desirability of gambling and casinos.

It is undisputed that the stated public policy of Nevada is strongly aligned with the promotion of legitimate and intensely regulated casino gaming which is free from criminal and corruptive elements. *See* N.R.S. § 463.0129. Utah, by comparison, has clearly demonstrated a public policy against such activity by not allowing any form of legalized gambling within its borders. *See* Supplement to Second Motion for Summary Judgment (# 43), Exhibit 22. Although California's public policy reflects an apparent objection to casino gambling, it allows almost every other form of gambling including a state lottery, horse racing, pari-mutual wagering, Indian gaming where unlimited bingo and slot machines are permitted, and card rooms. *Id.; see also Cabazon Band of Mission Indians,* 480 U.S. at 210–22, 107 S.Ct. at 1088–95; *Syucan Band of Mission Indians v. Roache,* 788 F.Supp. 1498, 1502–03 (S.D.Cal.1992); *compare Crockford's Club Limited v. Si-Ahmed,* 203 Cal.App.3d 1402, 250 Cal.Rptr. 728, 730 (1988).

Given the fact that the distance traveled by television broadcasts cannot be delineated as precisely as state borders, this Court recognizes that Defendants face a difficult task in reconciling the divergent public policies of California, Nevada, and Utah. Nonetheless, promotional advertising of casino gambling broadcast only from Nevada stations will serve an audience which consists overwhelmingly of Nevada residents within the borders of the State of Nevada, and involves conduct occurring lawfully within the confines of Nevada. Although the evidence before the Court suggests that an extremely small percentage of California and Utah residents may turn on their televisions and see KRNV or KVBC signals, this Court finds it difficult to accept that commercials about legalized casino gambling located in Nevada pose any real danger to the public policies of California and Utah regarding casino gambling. *Compare Edge Broadcasting Co.,* 732 F.Supp. at 639–41.

■ Recognizing Defendants' duty to attempt to respect the policies of all states

regarding gambling, and most importantly, the principles underlying the First Amendment's protection of commercial speech, this Court finds that Defendants' current application of § 1304 and § 73.1211, which effectively imposes a ban on Nevada television stations from broadcasting any promotional advertising relating to casino gambling, only remotely advances its federalism interest. Accordingly, such a ban fails the third prong of *Central Hudson*, and violates Plaintiffs' First Amendment rights to commercial free speech.

Finally, under the fourth prong of *Central Hudson*, a restriction on commercial speech must be no more extensive than necessary to further the asserted state interest. *Central Hudson*, 447 U.S. at 568–70, 100 S.Ct. at 2352–54. The Court finds that Defendants' present enforcement policy regarding § 1304 and § 73.1211 is not one which is the most narrowly drawn to serve its federalism interests. The deficiency in Defendants' enforcement policy is well illustrated by reference to expressed Congressional policy regarding advertising of state lotteries. In attempting to satisfy the interests of federalism and still respect the public policy views of both lottery and non-lottery states, Congress reached a sensible accommodation by limiting the broadcast of lottery advertisements to television or radio stations located within states which permit such activity. *See* 18 U.S.C. § 1307; 47 C.F.R. 73.1211. This Court fails to see why such a common sense restriction, which is undoubtedly less restrictive than Defendants' complete ban, would not equally apply with respect to casino and non-casino states. In light of this alternative, as well as the fact that broadcasts by KVBC and KRNV at best only incidentally impact the populations of California and Utah, this Court also finds that the categorical ban enforced by Defendants in this case provides "only the most incremental support" for Defendants' federalism interests. Therefore, it does not satisfy the "reasonable fit" required under the fourth prong of *Central Hudson. Compare City of Cincinnati v. Discovery Network, Inc., et al.,* —— U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993).

### D. Equal Protection

Finally, Plaintiffs claim that Defendants' current application of § 1304 and § 73.1211 violates the Equal Protection Clause. Unlike the third and fourth prongs of *Central Hudson*, which require that a regulation directly advance a substantial state interest in a narrowly drawn manner, to satisfy the requirements of the Equal Protection Clause, Defendants need only show a "legitimate state interest" which is not "wholly irrelevant to the achievement of the State's objective." *See Posadas*, 478 U.S. at 344–45 n. 9, 106 S.Ct. at 2978–79 n. 9; *Dunagin v. City of Oxford, Miss.*, 718 F.2d 738, 752–53 (5th Cir.1983) (*en banc*), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). Given that Defendants have demonstrated a substantial federalism interest and this Court cannot characterize Defendants' ban as "wholly irrelevant," Plaintiffs' Equal Protection claim must be rejected.

### IV. Conclusion

In sum, this Court finds that even though § 1304 does apply to Plaintiffs and does not violate the Equal Protection Clause, Defendants' wholesale ban on all broadcasts of promotional advertising of legalized casino gambling by Plaintiffs does not satisfy the requirements of *Central Hudson.* Plaintiffs KVBC and KRNV are, therefore, entitled to the declaratory relief they seek.

### ORDER

IT IS THEREFORE ORDERED that Plaintiffs' First Motion for Summary Judgment (# 18) is hereby denied.

IT IS FURTHER ORDERED that Plaintiffs' Second Motion for Summary Judgment (# 23) is hereby granted to the extent described above.

IT IS FURTHER ORDERED that Defendants' Cross–Motion for Summary Judgment (# 24) is hereby denied.