**EDGE BROADCASTING COMPANY, t/a Power 94, Plaintiff,**

v.

**UNITED STATES of America and Federal Communications Commission, Defendants.**

Civ. A. No. 88–693–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Feb. 23, 1990.

**634**

Conrad M. Shumadine, Walter D. Kelley, Jr. and Cecelia A. Wikenheiser, Willcox & Savage, P.C., Norfolk, Va., and Wayne G. Souza, Lyle, Siegel, Crowshaw & Beale, P.C., Virginia Beach, Va., for plaintiff.

John R. Bolton, Asst. Atty. Gen., Theodore C. Hirt and Margaret H. Plank, Attys., Dept. of Justice, Nancy Stanley, Atty., Federal Communications Com'n, Washington, D.C., Henry Hudson, U.S. Atty., and Michael Rhine, Asst. U.S. Atty., Norfolk, Va., for defendants.

FRANK A. KAUFMAN, Senior District Judge.[*]

Edge Broadcasting Corporation (Edge), a corporation with its principal place of business in Virginia Beach, Virginia, has, since 1988, operated the 100,000 watt radio station WMYK–FM known as "Power 94." That station is licensed by the Federal Communications Commission (FCC) to Elizabeth City, North Carolina, and broadcasts from Moyock, North Carolina, which is located approximately three miles south of the border between Virginia and North Carolina. Power 94 is one of twenty-four commercial radio stations serving the Hampton Roads, Virginia metropolitan area. According to Arbitron survey estimates,[1] approximately 92.2% of the persons who comprise Power 94's listening audience reside in Virginia, and approximately 7.8% reside in North Carolina. Although the station's signal reaches nine counties in North Carolina, fewer than 2% of all North Carolinians reside in those counties.

Edge challenges the constitutionality of two provisions of the federal lottery statute, namely, 18 U.S.C. §§ 1304 and 1307, which provide in pertinent part as follows:

§ **1304.** Whoever broadcasts by means of any radio station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme ... shall be fined not more than $1,000 or imprisoned not more than one year, or both.

§ **1307.** [An exemption from criminal liability under section 1304 is granted for] (a) ... an advertisement, list of prizes, or information concerning a lottery conducted by a State acting under the authority of state law—

. . . . .

* Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation.

1. The parties seemingly have each treated as reliable those survey estimates by the Arbitron Ratings Company.

(2) broadcast by a radio or television station licensed to a location in that state or an adjacent State which conducts such a lottery.

Corresponding regulations embodying the same substantive restrictions on lottery advertising as those statutory provisions are contained in 47 C.F.R. Part 73.1211. Those regulations also state that the FCC "may revoke any station license ... (6) for violation of section 1304." An additional statute also provides for a civil forfeiture penalty not to exceed $1,000 in the event of a section 1304 violation. 47 U.S.C. § 503(b)(1)(E).

The State of North Carolina does not sponsor a lottery, and its statutes make participation in and advertising of non-exempt raffles and lotteries a misdemeanor. N.C.Gen.Stat. §§ 14.289 and 14.291 (1983). On the other hand, the Commonwealth of Virginia is authorized by Virginia statute to sponsor a lottery, Va.Code Ann. § 58.1–4001 (1987), and since 1988, has conducted a series of lottery games.

In 1988, the Commonwealth paid $1,285,-141 in advertising costs to the media. In 1989, the Virginia Lottery Board estimated that those expenditures would reach in that year $2.3 million, including advertising over seven Hampton Roads radio stations. In addition, certain private businesses, located in the Hampton Roads area, include references in their own radio advertising to their status as lottery ticket outlets. According to Arbitron estimates, 38% of all radio listening in the area reached by Power 94 is directed to Virginia stations which include in their programs broadcasts of lottery advertising.

In addition to radio advertising, the Lottery Board purchases advertising space in the Hampton Roads area's two large newspapers, both of which also circulate in the North Carolina counties reached by Power 94's signal. Further, the Board presently spends nearly half of its advertising budget on television time, including purchases of time on four Hampton Roads television stations which reach the nine North Carolina counties served by Power 94 as well as additional areas of that state. Arbitron surveys estimate that 64% of all television viewing in those nine North Carolina counties is directed to Virginia television stations which carry such lottery advertising.

Edge estimates that it derives more than 95% of its local advertising revenues from sources in the State of Virginia, and alleges that its fear of being subjected to section 1304's criminal penalties has caused it to refrain from broadcasting any advertisements promoting the Virginia lottery. Power 94 has not sold advertising time to the State of Virginia for the broadcast of lottery promotions or to private businesses for advertising of their status as lottery outlets. As a result, Edge estimates that it has lost, and will continue to lose, advertising revenues totalling in the millions of dollars. To date, Edge has not been threatened with prosecution under section 1304. Specifically, in this case, plaintiff seeks a declaratory decree that sections 1304 and 1307 together with the corresponding FCC regulations, as applied to Edge, violate the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment, of the Constitution of the United States, and further seeks injunctive protection against enforcement of those statutes and regulations.

After alternate motions to dismiss and for summary judgment filed by the United States pursuant to Rules 12(b) and 56 of the Federal Rules of Civil Procedure were denied by this Court, counsel for both sides submitted this case for a decision by this Court on agreed facts, and presented written and oral legal arguments. For the reasons stated *infra*, this Court concludes that plaintiff is entitled to the relief it seeks in this case.

I.

The prohibition in sections 1304 and 1307 against the radio broadcast of lottery advertising and information by licensees located in non-lottery states is part of a comprehensive scheme of federal legislation regulating interstate transportation and mailing of lottery information. More than 100 years ago, Congress enacted a complete ban on the importation, mailing

and advertisement of lotteries, *Ex parte Rapier,* 143 U.S. 130, 133, 12 S.Ct. 374, 374, 36 L.Ed. 93 (1892), and extended that prohibition to radio broadcasting by the Communications Act of 1934,[2] *FCC v. American Broadcasting Co.,* 347 U.S. 284, 289, 74 S.Ct. 593, 597, 98 L.Ed. 699 (1954).

"The right of free speech does not include ... the right to use the facilities of radio without a license. The licensing system established by Congress in the Communications Act of 1934 was a proper exercise of its power over commerce." *National Broadcasting Co. v. United States,* 319 U.S. 190, 227, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943). Although, as Justice White has written, "broadcasting is clearly a medium affected by a First Amendment interest," *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386, 89 S.Ct. 1794, 1804, 23 L.Ed.2d 371 (1968), the Supreme Court has indicated that Congress possesses greater latitude to regulate broadcasting than other forms of communication. For example, in *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 74, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983), Justice Marshall observed: "Our decisions have recognized that the special interest of the federal Government in regulation of the broadcast media does not readily translate into a justification for regulation of other means of communication." (Footnote and citations omitted). And in *FCC v. American Broadcasting Co.,* 347 U.S. at 289, 74 S.Ct. at 597, the Supreme Court specifically extended to radio coverage the power of Congress constitutionally to restrict the interstate dissemination of lottery materials recognized in *Ex parte Rapier,* 143 U.S. at 133, 12 S.Ct. at 374. *See also New York State Broadcasters Ass'n, Inc. v. United States,* 414 F.2d 990, 996 (2d Cir.1969), *cert. denied,* 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

## II.

Section 1304's language prohibiting the broadcast of "any advertisement ... or information" concerning lotteries by stations licensed to locations in non-lottery states is so broad that it seemingly reaches noncommercial as well as commercial speech. "The Constitution ... accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 2349–50, 65 L.Ed.2d 341 (1980).

As Justice Scalia has recently written, commercial speech only enjoys " 'a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values,' and is subject to 'modes of regulation that might be impermissible in the realm of noncommercial expression.' *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456 [98 S.Ct. 1912, 1918, 56 L.Ed.2d 444] (1978)." *Board of Trustees of the State Univ. of New York v. Fox,* —— U.S. ——, ——, 109 S.Ct. 3028, 3033, 106 L.Ed.2d 388, 402 (1989). In contrast, content-based restrictions on noncommercial speech meet First Amendment standards "only in the most extraordinary circumstances." *Bolger,* 463 U.S. at 65, 103 S.Ct. at 2879. In *Bolger,* Justice Marshall noted that when such restrictions have been upheld, they have fallen into a few "specialized and limited categories" such as "libel," "obscenity," or "fighting words." *Id.* at 65, n. 7, 103 S.Ct. at 2879, n. 7.[3] Thus, at the outset, the question arises as to whether section 1304 bars only communication which does "no more than propose a commercial transaction," *Pittsburgh Press Co. v. Human Relations Comm'n,* 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973), or whether it also reaches noncommercial information. In this case, this Court's task with respect

---

**2.** The predecessor of 18 U.S.C. § 1304 is the former section 316 of the Communications Act of 1934, which, at the time of its passage in 1934, imposed criminal penalties upon any licensed radio broadcaster who "knowingly permits the broadcasting of, any advertisement of or information concerning any lottery...."

**3.** Seemingly, one should add to this list speech intended and likely to incite imminent lawless action. *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969).

to section 1304's application to noncommercial speech is rendered considerably easier by the government's statement in oral argument that the government would not oppose a decree limiting the application of section 1304 to Power 94's operations to the realm of commercial speech. That position accords with decided case law. For example, Judge Feinberg avoided invalidating section 1304 on First Amendment grounds by concluding that "the phrase 'information concerning any lottery' refers only to information that directly promotes a particular existing lottery" and does not prohibit the broadcasting of, for example, "an editorial for or against continuing the lottery experiment started by New York State in 1967." *New York Broadcasters Ass'n,* 414 F.2d at 997. *See,* to the same effect, *New Jersey State Lottery Comm'n v. United States,* 491 F.2d 219, 224 (3d Cir.1974) (Gibbons, J.) (en banc), *vacated as moot and remanded,* 420 U.S. 371, 95 S.Ct. 941, 43 L.Ed.2d 260 (1975); *Minnesota Newspapers Ass'n v. Postmaster General,* 677 F.Supp. 1400 (D.Minn.1987), *vacated as moot and remanded,* —— U.S. ——, 109 S.Ct. 1734, 104 L.Ed.2d 264 (1989).[4]

Power 94 alleges that it has not broadcast any information about the Virginia lottery, including news accounts of winning numbers and other announcements about the Virginia lottery, out of fear of prosecution under section 1304. To the extent that it may constitutionally restrict noncommer-cial speech, section 1304 must then either serve a compelling state interest or fall within one of the exceptions developed by the Supreme Court in *Bolger.* It does neither. No party has suggested that lottery information is either libelous or obscene, incites lawless action or constitutes "fighting words." As such, the broadcast of noncommercial lottery information falls into none of the exceptions from strict scrutiny.

In fact, the very reasons advanced herein by the government in support of its position with relationship to commercial speech indicate that as to noncommercial speech there are lacking compelling state interests. The purpose articulated by Congress for prohibiting non-lottery state broadcasts was to "free[ ] the means of communication to State-run lotteries to the maximum extent possible consistent with adequate Federal recognition of and protection for the policy of non-lottery States." S.Rep. 93–1404, 93rd Cong., 2d Sess. 3 (1974). A state's desire to limit the participation of its residents in lotteries sponsored by one or more other states, and the federal government's policy of honoring that preference,. simply do not rise to the level of the type of compelling state interests articulated in *Bolger* and, thus, do not justify reading section 1304's restrictions so as to cover noncommercial lottery information. It follows, as the government does not

---

**4.** In *New Jersey State Lottery,* a radio station licensed to the state sought a declaratory decree that section 1304 did not apply to the broadcast of a winning number in the New Jersey state-operated lottery. After the Third Circuit granted the petitions of the states of New Hampshire and Pennsylvania to intervene and after the Circuit, sitting en banc, reversed the ruling of the FCC adverse to that contention, the Supreme Court granted certiorari. However, thereafter, as it later did in *Minnesota Newspapers,* the Supreme Court vacated as moot the judgment below, in the light of the 1974 amendments to section 1307 which replaced what was in essence a blanket ban on lottery information broadcasts with the current statutory scheme. Dissenting, Justice Douglas wrote, *inter alia,* in a starred unnumbered footnote:

As the State of New Hampshire points out, the new § 1307 even on its face does not resolve the claims of all parties to this action. New Hampshire, which was granted leave to intervene in the Court of Appeals, conducts a lottery; neighboring Vermont does not. Title 18 U.S.C.A. § 1307(a)(2) (Supp. Feb. 1975), upon which the court relies, applies only to broadcasts by a station in the State which conducts the lottery, or in an adjacent State which also conducts a lottery; presumably, then, § 1304 remains applicable to a Vermont radio station which desires to broadcast information concerning the New Hampshire lottery. The restraint imposed by § 1304 will thus continue to inhibit the New Hampshire lottery with respect to certain groups of prospective participants, including New Hampshire residents who listen to Vermont radio stations and Vermont residents who might wish to cross the state line and participate. *United States v. New Jersey State Lottery Comm'n,* 420 U.S. 371, 375, 95 S.Ct. 941, 943, 43 L.Ed.2d 260 (1975). In this case, the questions which arise are, of course, similar to those to which Justice Douglas so referred.

oppose in this case, that sections 1304 and 1307 should not be read to prohibit Power 94 to broadcast noncommercial information about lotteries.

### III.

While commercial advertising is entitled to less protection under the First Amendment than noncommercial speech, it nonetheless has been afforded significant First Amendment safeguards since it "not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." *Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 561–62, 100 S.Ct. 2343, 2348–49, 65 L.Ed.2d 341 (1980). "Commercial speech that is not false or deceptive and does not concern unlawful activity ... may be restricted only in the service of a substantial governmental interest, and only through means that directly advance that interest." *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 638, 105 S.Ct. 2265, 2275, 85 L.Ed.2d 652 (1985), citing *Central Hudson Gas,* 447 U.S. at 566, 100 S.Ct. at 2351. The proponent of any such restriction has the burden of establishing that such restriction "directly advances a substantial government interest." *Id.* 471 U.S. at 641, 105 S.Ct. at 2276.

In *Central Hudson Gas & Electric Corp.,* Justice Powell enunciated a four-part analysis for determining the constitutionality of a restriction on commercial speech:

> At the outset, we must determine whether the expression is protected by the First Amendment. For commercial free speech to come within that provision, it must at least concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* 447 U.S. at 566, 100 S.Ct. at 2351. That four-part test has been uniformly accepted as the analytical framework for determining the constitutionality of restrictions upon commercial speech. *See, e.g., Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986); *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 507, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981); *Oklahoma Broadcasters Ass'n v. Crisp,* 636 F.Supp. 978, 980–81 (W.D. Okla.1985).

### IV.

In *Central Hudson,* Justice Powell reiterated the principle that "[t]he First Amendment's concern for commercial speech is based on the informational function of advertising." *Id.* 447 U.S. at 563, 100 S.Ct. at 2350. Thus, the first prong of the *Central Hudson* test examines whether the activity spoken of is lawful and whether the information imparted is truthful. "[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Id.*

Power 94 wishes to broadcast advertising about the Virginia lottery sponsored by both the state itself and private sales outlets located in the Hampton Roads areas. The Virginia lottery was lawfully created by the state's voters in a November 3, 1987 referendum and established by Virginia statute. Va.Code Ann. § 58.1–4001 (1987). The legality of advertising about the Virginia lottery is thus undisputed.

Similarly, defendants do not suggest that the advertising at issue in this case would be misleading or deceptive. Indeed, the government has acknowledged that the content Edge wishes to broadcast is truthful. Thus, Edge has no difficulty meeting in this case the first prong of the *Central Hudson* test.

■ The second prong of that test concerns the substantiality of the government interest. In this litigation, the government characterizes the interests served by sections 1304 and 1307 as the furtherance of fundamental interests of federalism enabling non-lottery states to discourage gambling. Those interests are similar to

other "substantial" interests which have been accepted as complying with *Central Hudson's* second standard. For example, a state statutory prohibition upon liquor advertising—a restriction designed to reduce consumption of alcohol—has been upheld, *Oklahoma Broadcasters Ass'n v. Crisp*, 636 F.Supp. at 982; and a state law restriction on utility advertising designed to reduce energy consumption has been recognized as valid, *Central Hudson*, 447 U.S. at 568–69, 100 S.Ct. at 2352–53. In those cases, state laws have been involved. Herein, it is federal legislation whose validity is at issue. But Congress may assist states in inhibiting activity considered by a state to be contrary to public policy by regulating the promotion by radio broadcasting. *See New York State Broadcasters*, 414 F.2d at 996–97 (substantial government interest served in federal ban on lottery advertising); *Banzhaf v. FCC*, 405 F.2d 1082, 1101 (D.C.Cir.1968) (FCC regulation of cigarette advertising intended to reduce cigarette consumption implied).

More than a century ago, in *Ex parte Rapier*, 143 U.S. at 133, 12 S.Ct. at 374, the Supreme Court sustained the constitutionality of precursor provisions to 18 U.S.C. § 1302, a statute barring use of the mails for lottery promotion and the basis for the predecessor provision to section 1304. Although both social attitudes and legal proscriptions regarding gambling have seemingly eased in the intervening century, the desire of a state to regulate gambling is still respected by the courts. Thus, in 1986, in *Posadas*, the Supreme Court upheld Puerto Rican legislation restricting the advertising of casino gambling. *Posadas*, 478 U.S. at 341, 106 S.Ct. at 2976. Edge, in support of its contention that the interest of the State of North Carolina is not sufficiently substantial, emphasizes the fact that attitudes with respect to lotteries have changed dramatically in past decades, to the point where at least 33 states now sponsor their own lotteries. Further, Edge asserts that section 1307's exemption for broadcasters located in states where lotteries are legal acknowledges that the interest in reducing consumption is insubstantial and, moreover, that interests of federalism

are in this day and age best served by leaving decisions concerning lottery advertising to the states.

The "substantial interest" standard, *i.e.*, the second prong of the *Central Hudson* test, is not a strict one. Thus, in *Posadas*, the Supreme Court recognized Puerto Rico's substantial interest in the reduction of gambling, even though the regulation at issue in that case only restricted selected forms of advertising of casino gambling while permitting advertising of other forms of gambling. *Posadas*, 478 U.S. at 344, 106 S.Ct. at 2978. In that context, the federal government's interest in protecting the desires of a non-lottery state, *i.e.*, North Carolina, to limit lottery participation must still be termed "substantial."

■ The third prong of the *Central Hudson* test requires that a restriction on protected commercial speech directly advance the interest of the jurisdiction whose legislation is challenged. If a prohibition provides only "ineffective or remote support" for such objective, it fails under the First Amendment. *Central Hudson*, 447 U.S. at 564, 100 S.Ct. at 2350. The facts of this case demonstrate that sections 1304 and 1307 constitute ineffectual means of reducing lottery participation by the North Carolina residents in Power 94's service area because the North Carolina residents within the area of Power 94's signal receive most of their radio, newspaper and television communication from Virginia-based media. It is probably true that a relatively small number of North Carolina listeners who listen only or mainly to Power 94 may hear significantly less lottery advertising because of their allegiance to that station, and that other North Carolinians may hear slightly less lottery advertising because they occasionally listen to Power 94. However, those possibilities do not sufficiently constitute "direct advancement" of the state's interest under the third prong of the *Central Hudson* test which makes clear that "conditional and remote eventualities simply cannot justify silencing ... promotional advertising." *Id.* at 569, 100 S.Ct. at 2353. In *Central Hudson*, the Supreme Court held that New York State did not

meet its burden of demonstrating that a ban on utility company advertising would directly advance the goal of promoting fair and efficient rates. *Id. See also Bolger,* 463 U.S. 60, 73, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983), in which, dealing with a First Amendment challenge to a federal postal ban on the mailing of unsolicited contraceptive advertisements, the Supreme Court rejected the state's premise that the regulation sufficiently advanced the goal of aiding parents' efforts to supervise their children's birth control education. Since parents already largely control the receipt of household mail, and since children are exposed to significant external information, the statute offered "only the most limited incremental support for the interest asserted," and thus, failed First Amendment scrutiny. *Id.* at 73, 103 S.Ct. at 2884.[5]

Similarly, in *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), the Supreme Court insisted that a state government must identify a direct link between the interest asserted and the regulation at issue. Rejecting the argument of the State of Ohio that a ban on the use of illustrations in attorney advertising advanced the goal of preventing deceptive promotion of legal services, Justice White observed that "acceptance of that State's argument would be tantamount to adoption of the principle that a state may prohibit the use of pictures or illustrations in connection with advertising of any product or service simply on the strength of the general argument that the visual content of such advertisements may, under some circumstances, be deceptive or manipulative. But as we stated above, broad prophylactic rules may not be so lightly justified if the protections afforded commercial speech are to retain their force." *Id.* at 649, 105 S.Ct. at 2280–81.

Like the prohibition in *Zauderer,* the application of section 1304 to Edge can only speculatively advance the goals of the State of North Carolina. Moreover, to the

extent that that provision does reduce lottery participation by North Carolina residents, that reduction is necessarily so slight as to be the kind of "remote" support rejected in *Central Hudson* as not "directly advanc[ing]" either interests of federalism or limitations on lottery sales. *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350.

At most, the goals of sections 1304 and 1307 are only implicated in this case with respect to the 8% of Power 94's listening audience which resides in the nine counties of North Carolina within the station's signal. The population of those nine counties is 127,000, less than 2% of North Carolina's total population, but still a sizeable population group. However, a significant number of residents of that area listens to broadcasts of Virginia-based radio stations, views Virginia-based television and reads Virginia newspaper advertising. Thus, application of section 1304's advertising ban to the activities of Power 94 hardly more than "remotely" and "marginally" advances the goals of the State of North Carolina to limit the knowledge of North Carolinians about the Virginia lottery. According to Arbitron estimates, 79% of all radio stations whose broadcast signals reach the nine North Carolina counties served by Power 94 are licensed to Virginia locations and may advertise Virginia lottery promotions; approximately 62% of all radio listening by residents in those counties is directed to radio stations licensed to locations in Virginia; and 38% of the radio listening in the Power 94 service area is directed at stations which broadcast lottery advertising. Only 11% of the radio listening in the nine-county area is directed at Power 94. Thus, in fact, radio listeners in that area are more than three times more likely to be listening to a station broadcasting Virginia lottery promotions than to Power 94.

Also, residents of the nine-county area are exposed to significant lottery advertis-

---

**5.** *Bolger* does suggest, however, that a broadcast ban on contraceptive advertising may perhaps pass First Amendment scrutiny on the grounds that parents have less control over the television viewing habits of their children than with regard to receipt and reading of mail by children. 463 U.S. at 74, 103 S.Ct. at 2884.

ing on television. Surveys [6] indicate that while American adults spend 29% of their media consumption time listening to the radio, they spend 60% watching television. Not surprisingly, the Virginia Lottery Board has spent nearly half of its advertising budget on television time, including purchases from four Norfolk area television stations. Those stations enjoy large audiences in the nine-county Power 94 service area, as well as in sections of North Carolina not reached by Power 94's signal. Within the nine counties, Arbitron estimates that more than 75% of all television viewing in four of those counties is directed at Virginia stations; between 50 and 75% is directed at Virginia stations in three counties; and between 25 and 50% is so directed in two counties. Therefore, sections 1304 and 1307, at most, have only a remote impact on Virginia lottery sales among North Carolina residents, and can hardly be said "directly [to] advance" the federal government's interests in supporting the goals of the State of North Carolina. Further, newspaper advertising by the Virginia press is a source of additional exposure to lottery advertising in North Carolina. In the nine-county area, the circulation of two Virginia-based newspapers is approximately 10,400 newspapers daily and 12,500 on Sundays.

In sum, North Carolinians in Power 94's service area experience pervasive exposure to Virginia lottery advertising through telecast, broadcast and print media. Presumably, the State of Virginia and local Virginia-based lottery outlets determine their advertising budgets and allocate purchases of advertising among available broadcasters. Thus, if Power 94 cannot air lottery promotions, advertisers will simply purchase from other broadcasters, and other media, which direct their messages into the area of North Carolina reached by Power 94. Ultimately, the application of sections 1304 and 1307 does not substantially reduce the volume of advertising about the Virginia lottery which reaches residents of North Carolina. Thus, those statutory provisions fail materially to protect North Car-

olina residents from the harms which may result from lottery advertising. Given that degree of ineffectiveness, those provisions do not meaningfully address the concerns of North Carolina or federalism's concerns for those state interests, and do not pass muster under the third prong of the *Central Hudson* test. Accordingly, although, for reasons stated *supra*, the challenged federal statutory proscriptions do pass muster under the first two standards of *Central Hudson*, and for reasons stated *infra*, under the fourth standard of that case, Edge is entitled to the relief it seeks herein.

Under the fourth prong of the *Central Hudson* test, a restriction on commercial speech may be "no more extensive than necessary to further the state's interest," 447 U.S. at 569–70, 100 S.Ct. at 2353–54. Edge contends that because the federal government's interests could be met by dropping section 1304 and leaving regulation of lottery advertising to the states themselves, the statute fails to meet that standard.

■ If the *Central Hudson* framework is construed as imposing a "least restrictive alternative" requirement, then that argument by Edge might succeed. But that interpretation is not permitted by *Board of Trustees of the State Univ. of New York v. Fox*, ── U.S. ──, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989), in which Justice Scalia construed the fourth *Central Hudson* standard as establishing "something short of a least restrictive means standard," *id.* at ──, 109 S.Ct. at 3033, 106 L.Ed.2d at 401, and described it as one based on "reasonable" legislative judgment, necessitating "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served;' that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective." *Id.* at ──, 109 S.Ct. at 3035, 106 L.Ed.2d at 404 (citation omitted).

**6.** These statistics are taken from surveys conducted by the Television Bureau of Advertising and are set forth in the joint stipulation of facts submitted by both sides in this case.

The statutory scheme put in place by sections 1304 and 1307 is not unreasonable. Presumably, in many instances, broadcasters located in non-lottery states will serve substantial populations in those states; under such circumstances, there may well be a "fit" between the statute and its objective. Short of leaving regulation to the states, it is difficult to envision a more narrowly-tailored set of provisions than those set forth in sections 1304 and 1307. Accordingly, those sections do pass muster under *Fox*'s relaxation of the fourth *Central Hudson* standard.

That conclusion, however, as indicated *supra*, does not validate the application of sections 1304 and 1307 to Power 94, because that application violates *Central Hudson*'s third-prong. And, that remains true despite the availability to the government of certain language in *Posadas*, 478 U.S. 328, 106 S.Ct. 2968, which arguably supports the opposite conclusion.

## V.

In *Posadas*, in the course of applying the four-pronged *Central Hudson* test, Justice Rehnquist concluded that the advertising concerned a lawful activity, was not misleading, and met *Central Hudson*'s first test. *Id.* at 340–41, 106 S.Ct. at 2976–77. Then, he determined that Puerto Rico's interest in protecting the safety and welfare of its residents from the harms associated with gambling was a substantial interest and was valid under the second test. *Id.* at 341, 106 S.Ct. at 2976. As to the third prong of *Central Hudson*, Justice Rehnquist concluded that the Puerto Rico legislature's premise that the restriction on advertising would decrease gambling was reasonable and that its implementation directly advanced the purpose of the legislation. *Id.* at 343, 106 S.Ct. at 2977–78. Fi-

nally, as to *Central Hudson*'s fourth prong, viewing the statute as construed by Puerto Rico's Supreme Court, the Justice concluded that the statute was no more restrictive than necessary. *Id.*[7]

The casino which challenged the constitutionality of the statutory application argued that Puerto Rico's legislature, having itself legalized casino gambling, could then not attempt to reduce demand for gambling by restrictions upon advertising. Disagreeing, Justice Rehnquist stated that "it is precisely *because* the government could have enacted a wholesale prohibition of the underlying conduct that it is permissible for the government to take the less intrusive step of allowing the conduct, but reducing the demand through restrictions on advertising," *Posadas*, 478 U.S. at 346, 106 S.Ct. at 2979, and that only "a strange constitutional doctrine ... would concede to the legislature the authority to totally ban a product or activity, but deny to the legislature the authority to forbid the stimulation of demand for the product or activity through advertising on behalf of those who would profit from such increased demand." *Id.* Relying on that language, the government suggests in this case that, under *Posadas*, commercial speech concerning activities which a state may ban entirely has no First Amendment protection, and that, therefore, restrictions upon advertising of casino gambling, cigarette and alcohol sales, prostitution, and lotteries are not violative of the First Amendment.

Justice Brennan, joined by Justices Marshall and Blackmun in dissent, expressed the view that the majority decision gives "government officials unprecedented authority to eviscerate constitutionally protected expression." *Id.* at 358–59, 106 S.Ct. at 2985–86.[8] Justice Stevens, also

---

**7.** The statute and regulations at issue in *Posadas* barred advertising of casino gambling "to the public of Puerto Rico." P.R.Laws Ann. tit. 15, § 77 (1972). While Puerto Rico's state tourism company interpreted the law to bar use of the work "casino" in any advertising which might reach Puerto Rican residents, the Superior Court of Puerto Rico devised a narrowing construction of the statute limiting its prohibition to advertisements intended to "attract the resident" of Puerto Rico. That construction was

adopted by Puerto Rico's Supreme Court and accepted by the Supreme Court of the United States. *Posadas*, 478 U.S. at 339, 106 S.Ct. at 2975.

**8.** Justice Brennan in his dissent described *Posadas* as "dramatically shrinking the scope of First Amendment protection available to commercial speech." 478 U.S. at 358–59, 106 S.Ct. at 2985–86.

dissenting, commented that "[w]hether a State may ban all advertising of an activity that it permits but could prohibit—such as gambling, prostitution, or the consumption of marijuana or liquor—is an elegant question of constitutional law." *Id.* at 359, 106 S.Ct. at 2986. Against that background, during recent hearings concerning section 1304 and related statutory provisions, a Justice Department representative stated that the *Posadas* analysis "certainly contrasts with the approach in *Central Hudson*" and that "it remains to be seen whether the Court in future cases will take" the established *Central Hudson* approach, or rely on *Posadas'* blanket deference to the legislature.[9] Commentators have also raised questions with regard to what they believe is an inconsistency between Justice Rehnquist's approach in *Posadas* and the standards of *Central Hudson*.[10] To date, however, as far as this Court is informed, neither the Supreme Court nor any lower federal court, in the wake of *Posadas*, has yet held a commercial speech restriction constitutional which would not have passed scrutiny under the traditional *Central Hudson* tests.[11] Accordingly, this Court, in this case, follows *Central Hudson*, and concludes, for the reasons set forth *supra*, that the challenged federal statutory provisions as applied to Power 94 are violative of the third prong of *Central Hudson*.

## VI.

■ There remains the question of whether such a holding could and should be avoided by the adoption of narrow constructions of sections 1304 and 1307. Such an approach is generally favored by the courts, *DeBartolo Corp. v. Fla. Gulf*

*Coast Building & Construction Trades Council,* 485 U.S. 568, 573–76, 108 S.Ct. 1392, 1396–98, 99 L.Ed.2d 645, 654–55 (1988), and was utilized in *Posadas,* 478 U.S. at 339, 106 S.Ct. at 2975. Two such constructions are possible: (1) an interpretation of section 1304 eliminating prohibitions on noncommercial speech from the scope of those statutes; and (2) a reading of section 1307 which bars non-lottery state broadcasters only from airing advertising directed at their own residents.

"The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality," *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895). That rule has recently been characterized as a "cardinal principle" which "has its roots in Chief Justice Marshall's opinion for the Court in *Murray v. The Charming Betsy,* 2 Cranch 64, 2 L.Ed. 208 (1804), and has for so long been applied by this Court that it is beyond debate." *DeBartolo,* 485 U.S. at 575, 108 S.Ct. at 1397, 99 L.Ed.2d at 654. Indeed, the rule is brought into play "so as to avoid not only the conclusion that [a statute] is unconstitutional, but also grave doubts upon that score." *Moore Ice Cream v. Rose,* 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933). Nevertheless, it is not easy to cite to firm guidelines as to when a given constitutionally dubious statute may be amenable to a narrowing interpretation. In *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), Chief Justice Hughes wrote that when contemplating a narrowing construction, a court should "first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be

---

**9.** Testimony of Douglas W. Kmiec, Dep. Asst. Att'y General, Dept. of Justice, Hearings before the House Judiciary Comm., House Report 100–577, Lottery Advertising Clarification Act of 1988, 100th Cong., 2d Sess. (1988) p. 11–12.

**10.** D. Lively, "The Supreme Court & Commercial Speech," 72 Minn.L.Rev. 289 (1987); M. Nutt, "Recent Developments in First Amendment Protection of Commercial Speech," 41 Vand.L.Rev. 173, 205 (1988); F. Schauer, "Commercial Speech and the Architecture of the First Amendment," 56 U.Cinn.L.Rev. 1181, 1182 (1988); "The Supreme Court—Leading Cases,"

100 Harv.L.Rev. 100, 177–78 (1986) ("Had Justice Rehnquist applied the *Central Hudson* test with vigor, he would have struck down Puerto Rico's law on the ground that it was enacted in pursuit of too insubstantial a purpose to justify the interference with individual choice.").

**11.** Nor have the cases which have cited *Posadas, see, e.g., U.S. Postal Service v. C.E.C. Services,* 869 F.2d 184, 187 (2d Cir.1989); *Hillman Flying Service, Inc. v. City of Roanoke,* 652 F.Supp. 1142, 1149 (W.D.Va.1987), indicated any conflict between *Posadas* and *Central Hudson*.

avoided." *Id.* at 62, 52 S.Ct. at 296. However, Justice Cardozo later warned that "avoidance of a difficulty will not be pressed to the point of disingenuous evasion." *Moore*, 289 U.S. at 379, 53 S.Ct. at 622.

Whether a potential narrowing construction is "fairly possible" or "disingenuous evasion" seemingly turns principally upon legislative intent. In *Moore*, the Court concluded that "the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power." *Id.* More recently, in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), Chief Justice Burger looked to whether the possibly unconstitutional aspect of a statute was the product of "the affirmative intent of the Congress clearly expressed." *Id.* at 501, 99 S.Ct. at 1319, quoting *Benz v. Compania Naviera Hidalgo*, 353 U.S. 138, 147, 77 S.Ct. 699, 704, 1 L.Ed.2d 709 (1957).

In this case, as discussed *supra*, the government does not object to a narrowing construction by which section 1304 is read to cover advertising only and to exclude news. As discussed *supra*, any interpretation of section 1304 which includes a ban on noncommercial speech would render that section unconstitutional. Moreover, a construction excluding noncommercial speech from the scope of the statute is "fairly possible." Nothing in the recent legislative history of the federal lottery statute suggests that Congress intended to prohibit the broadcast of lottery information not designed to increase lottery participation.[12]

The second proposed narrowing construction, however, poses considerably greater problems, and materially affects section 1307's exemption for advertising "concerning a lottery conducted by a State acting under the authority of State law ... broadcast by a radio or television station licensed to a location in that State or an adjacent State which conducts such a lottery." That provision, under the suggested second narrowing construction, would be read to permit broadcasters licensed to non-lottery states—and thus not falling within the specific language of the exception—to air Virginia lottery advertising not directed to North Carolina residents.

Edge contends that that type of construction is similar to the interpretation given in *Posadas* to the Puerto Rico gambling statute by the Superior Court of Puerto Rico. That court narrowly construed a general ban on all advertising of casino gambling "to the public of Puerto Rico" so as to forbid only advertisements "contracted with an advertising agency, for consideration, to attract the residents to bet at the dice, card, roulette and bingo tables." *Id.* 478 U.S. at 355, 106 S.Ct. at 2984. Edge asserts that *Posadas* bestows a kind of "imprimatur" upon a similar narrowing construction of section 1307 by this Court. However, the language of the statutes and the respective circumstances surrounding their enactment are dissimilar.

In *Posadas*, the Court was confronted with general statutory language, to which the Puerto Rican Court supplied specific terms. Moreover, it is practically feasible to identify a series of distinct forms of advertising directed at tourists who, largely, while in Puerto Rico, reside at resort hotels and speak a different native language than do many Puerto Rican residents. In contrast, section 1307's highly specific language expressly exempts a carefully defined set of broadcasters from section 1304's provisions. The basis for the exemption, location of license, accords with the long-standing concept of "community of license" which has been central to the FCC's licensing scheme since the enactment of the Communications Act of 1934. It is not "fairly possible" to interpret that language in a manner which ignores that statutory concept. In addition, it hardly seems possible for advertising to be designed which will induce Virginian listeners to participate in the lottery and at the same time not attract North Carolina residents. Both groups are members of the same listening audience, and Edge has not provided—and seemingly cannot provide—any evidence of demographic or other differences, or in the content of lottery advertising,

---

12. That history dates from the early 1970s when states first authorized lotteries.

which would make advertising directed to non-North Carolinians feasible. In short, the *Posadas* solution cannot be comfortably grafted on the situation in this case.

Perhaps even more important is the fact that the legislative history of sections 1304 and 1307 does not permit such a narrowing construction. Prior to 1974, section 1304 barred the broadcast of all lottery advertising. In that year, section 1307 was added to provide the exceptions currently in effect. In crafting those exemptions, Congress considered a number of alternatives,[13] and was well aware, as the House Report reveals, that basing exceptions upon license location would create inequities, since "broadcast signals, as a technological matter, cannot be confined to political boundaries."[14]

In the 1974 amendments, Congress sought primarily to rectify the situation in which "the policy determinations of some States in authorizing a lottery are inhibited by provisions of Federal law even though the lottery functions only in that State."[15] The House Judiciary Committee specifically acknowledged that section 1307 was an imperfect solution: "in considering this legislation the committee was faced with the task of making a reasonable balance between Federal and State interests in this area," *id.* at 7011, and opted in favor of "protection of the policies and the interests of the States which do not provide for such lotteries." *Id.*

Initially, in 1974, the proposed legislation which became section 1307 limited lottery advertising to stations "located in" lottery states. The FCC then recommended the use of location of license as a more precise criterion, and a letter to the Committee from the FCC chairman set forth the reasoning and implications of that distinction.[16] At that point, the Committee amended its initial draft to include license location language.[17]

In 1988, Congress enacted a series of amendments which permitted lotteries sponsored by nonprofit organizations.[18] The initial proposed amendments in that year[19] contained a provision which would have expanded the section 1307 exemption to all advertising concerning any lottery "conducted by a State acting under the authority of state law," and would have therefore eliminated reliance upon the license location. During hearings, testimony was presented by representatives of the Justice Department and the FCC supporting such an amendment on the ground that the existing law produced inequitable results,[20] and the President of the National Association of Broadcasters specifically testified at House Judiciary hearings to the problems experienced by broadcasters—like Edge—licensed to locations near state borders.[21]

The bill did pass the House without the language keyed to location of license. However, in the Senate, the bill was amended to remove the changes in section 1307 concerning broadcast of lottery advertising and to retain language keyed to license location. Eventually, the House concurred with the Senate's action. Thus, Congress, having reconsidered the explicit exemption scheme of section 1307 once again in 1988, essentially ratified it.

In sum, the legislative history of the 1974 and 1988 amendments to the lottery

---

**13.** H.Rep. No. 93–1517, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 7007, 7010, 7022 [hereinafter cited as H.Rep.]

**14.** Letter of FCC Chairman Richard E. Wiley, H.Rep. at 7021.

**15.** H.Rep. at 7010–11.

**16.** *Id.* at 7021–22.

**17.** *Id.* at 7007.

**18.** P.L. 100–625, The Charity Games Advertising Clarification Act of 1988.

**19.** *See* P.L. 100–625, HR 3146.

**20.** H.Rep. 100–557, 100th Cong., 2d Sess., statements of Dennis Patrick, FCC Chairman, at 7 and Douglas W. Kmiec, Dep. Asst. Attorney General, Dept. of Justice at 9–10 (1987).

**21.** Lottery Advertising Clarification Act of 1988, Hearings on H.R. 3146 before the Subcomm. on Ad.Law and Government, House Comm. on the Judiciary, 100th Cong., 2d Sess. 57 (1987) (Testimony of Edward O. Fritts).

statute reveals that the specific provisions of the section 1307 exception are the result of "the affirmative intention of the Congress clearly expressed." *Catholic Bishop*, 440 U.S. at 501, 99 S.Ct. at 1319. In that context, it is just not "fairly possible" to construe those provisions so as to ignore Congress' decision to regulate the broadcast of lottery advertising according to the license location of the broadcaster. Accordingly, a contrary narrowing construction, which would avoid the invalidation of the application of sections 1304 and 1307 to Power 94, is not appropriate. In this case, such invalidation is therefore required for the reasons stated *supra.*

### CONCLUSION

This Court will enter a Decree in this case construing sections 1304 and 1307 as relating only to commercial speech and holding that the application of sections 1304 and 1307 to Edge's operation of Power 94 is constitutionally invalid as to commercial speech.